Wright-Bernet, Inc., a corporation v. Commissioner.
Wright-Bernet, Inc. v. Commissioner
Docket No. 12201.
United States Tax Court
1947 Tax Ct. Memo LEXIS 17; 6 T.C.M. (CCH) 1278; T.C.M. (RIA) 47325; December 18, 1947
*17 Petitioner in the taxable years 1942 and 1943 was engaged in the manufacture and sale at wholesale of brushes of various kinds and sizes. It had a large volume of sales and substantial profits in each of the taxable years. It had four officers who not only looked after problems of production and management but did all the selling as well. The Commissioner in his determination of the deficiencies determined that the amounts which petitioner had deducted for compensation incurred and paid to its four officers exceeded that which was reasonable and on that ground he disallowed part of the deductions claimed by the taxpayer. Held, the Commissioner erred in part in the deductions which he disallowed and reasonable compensation for each of these four officers to be allowed as deductions is found from the evidence. Robert S. Marx, Esq., Carl Runge, Esq., 900 Traction Bldg., Cincinnati, Ohio, and Edward M. Brown, Esq., for the petitioner. A. J. Friedman, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's declared value excess profits tax for the year 1942 of $3,153.02 and in petitioner's excess profits tax for the year 1942 of $16,859.42 and for the year 1943 of $31,633.65. The deficiencies for 1942 are due to the following adjustments made by the Commissioner in the net income as reported by petitioner on its return for the year 1942: Unallowable deductions and additional
income: (a) Repairs
$ 3,800.00
(b) Compensation of officers
20,600.00
Total
$24,400.00
Nontaxable income and additional de-
ductions: (c) Capital stock tax
437.50
(d) Depreciation
76.00
(e) Renegotiation
15,000.00
Total
$15,513.50
Adjustment (b) above which is the only one which *19 petitioner contests is explained in the deficiency notice as follows: "(b) It is determined that the deduction for compensation of officers claimed in your return for the calendar year 1942, exceeded a reasonable allowance for compensation for services actually rendered within the meaning of section 23 (a), as follows: Amount
Amount
Amount
Dis-
Officer
Deducted
Allowed
allowed
Frank W. Bernet
$16,180
$11,000
$ 5,180
Carl P. Bernet
15,140
10,000
5,140
Hubert A. Bernet
15,140
10,000
5,140
J. W. Beahn
15,140
10,000
5,140
$61,600
$41,000
$20,600"
The deficiency for the year 1943 is due to following adjustments made in the net income as reported by petitioner on its return filed for that year: Unallowable deductions and additional
income: (a) Capital stock tax
$ 375.00
(b) Compensation of officers
32,840.00
Total
$33,215.00
Nontaxable income and additional de-
ductions: (c) Depreciation
$ 152.00
Adjustment (b) above which is the only one that petitioner contests is explained in the deficiency notice as follows: "(b) It is determined that the deduction for compensation of officers claimed in your *20 return for the calendar year 1943, exceeded a reasonable allowance for compensation for services actually rendered within the meaning of section 23 (a), as follows: Amount
Amount
Amount
Dis-
Officer
Deducted
Allowed
allowed
Frank W. Bernet
$19,240
$11,000
$ 8,240
Carl P. Bernet
18,200
10,000
8,200
Hubert A. Bernet
18,200
10,000
8,200
J. W. Beahn
18,200
10,000
8,200
$73,840
$41,000
$32,840"
Petitioner by appropriate assignments of error contests the correctness of the Commissioner's adjustment (b) for each of the taxable years. Thus the only issue which we have for our decision is as to the reasonableness of the salaries which petitioner incurred and paid to each of its four officers in the taxable years. The facts were established by a stipulation of facts, oral testimony and documentary evidence. Findings of Fact The stipulated facts are found accordingly. The petitioner is a corporation duly organized and doing business under the laws of the State of Ohio, with its principal office and place of business in Hamilton, Ohio. It is engaged in the manufacture and sale of brushes. The returns for the periods here involved *21 were filed with the Collector of Internal Revenue for the First District of Ohio. In 1934 J. Warren Beahn was the manager of the Chicago offices of the Ox Fibre Brush Company, the largest manufacturer of household and industrial brushes in the country. As manager of the Chicago office, Beahn had charge of the entire sales of the Ox Fibre Brush Company in the midwest territory and had three other men under him as his assistants in handling sales in that territory. At that time William A. Wright was the manager of the western factory of the Ox Fibre Brush Company located at Seymour, Indiana, having previously been in charge of purchasing at the Frederick, Maryland plant of the Ox Fibre Company. The three Bernet brothers, Frank, Carl and Hubert, also were associated with the Ox Fibre Brush Company. Frank Bernet was in charge of sales out of the Cincinnati office and personally covered the northeastern territory, including Ohio, New York, Pennsylvania and Washington, D.C. Hubert's sales territory included the entire southeast from the Atlantic Seaboard to the Mississippi and from the Ohio River to the Gulf. Carl's territory covered part of Kentucky, Tennessee, Alabama, Louisiana and *22 west through Texas, up through Oklahoma, Kansas, Missouri, Southern Illinois, and Indiana. All of these men had been engaged in the brush business for many years - Beahn from 1926; Frank Bernet "pioneered" with the Ox Fibre Brush Company, having started with that company in 1909; Carl had been with the Ox Fibre Brush Company since 1923 and Hubert had started with the Ox Fibre Company in 1919 after the first World War. The father of the Bernet brothers had also been in the brush business, having been with the Bromwell Brush and Wire Goods Company from the time he was 14 years old until he died in 1934 at the age of 74. In 1934 these five men and a sixth who dropped out shortly thereafter, decided to leave the Ox Fibre Company and organize a company of their own. They organized a small Ohio corporation under the laws of the State of Ohio and invested their savings in the company, which originally had outstanding 130 shares of common stock of the par value $100of per share. The company was started in a small space in a building in Hamilton, Ohio, with two machines. During the early years of the business additional machines were gradually acquired and more space in the original building *23 was taken as sales expanded. During those early years Wright, in view of his experience as production manager of Ox Fibre's Seymour, Indiana branch, took charge of all production problems, including purchasing, employment and supervision of personnel. Frank, Carl and Hubert Bernet and Beahn handled all of the sales and covered the same territories they had previously had as salesmen with the Ox Fibre Company. With the exception of a broker in Baltimore, these four men handled the entire sales of the company. Development of the business of the company was not easy as the exhibits attached to the stipulation of facts clearly indicate. While net sales of the company steadily increased (with the exception of a drop in 1938) from a first year's sales of $80,000 to net sales of $281,000 in 1940, the company sustained a net loss after federal taxes of $3,300 in 1935, $125 in 1937, $697 in 1938 and made a small net profit of $960 in 1936, $4,000 in 1939 and $5,000 in 1940. In order to keep the company going and to build up its business in those early years the five men accepted what amounted to only nominal compensation. In 1935 they drew only $905 each; in 1936, $1,387.50; in 1937, $1,601.25; *24 in 1938, $2,565 and in 1939, $2,270 cash. Not only did these five men accept inadequate compensation during those early years in order to conserve the cash position of the company, but from time to time they contributed additional money to the capital of the company and induced friends and relatives to put money into the enterprise. In 1936 the outstanding shares of the common stock were increased from 130 to 180. In 1937 five additional shares were sold; in 1940 $6,000 more was put into the business by these men; in 1941 $9,000 more was put into the business on the issuance of preferred stock; and in 1942 an additional $3,500 was invested in the preferred stock. During the tax years in question the three Bernet brothers each owned 40 shares of the common and 10 shares of the preferred stock and Beahn owned 65 shares of the common and 10 shares of the preferred stock. As of the years 1942 and 1943, the three Bernet brothers and Beahn together owned approximately 75 per cent of the outstanding common stock and 32 per cent of the outstanding preferred stock; the remainder of the outstanding common and preferred stock was held by outsiders who were friends or relatives. In July *25 of 1940, Wright, who had been president and director of the company from its inception and who had handled all of the managerial duties connected with production, purchasing and supervision of personnel of the company, died and the four survivors were faced with a serious problem in the loss of the company's production manager. Because the three Bernet brothers and Beahn had the knowledge, experience and familiarity with the many grades and types of products which went into the petitioner's brushes, it was decided when Wright died that the four survivors would take over his entire managerial duties with regard to production, in addition to continuing to sell the entire output of the company. Since 1940. and including the tax years in question, these four men, J. Warren Beahn, Frank Bernet, Carl Bernet and Hubert Bernet, have handled the entire administrative and executive duties, have supervised the entire production of the company, have done all of the purchasing of materials, employed the personnel, compiled the catalogues and prepared the advertising of the company, developed and built new and special machines and have sold the entire output of the company. Each of the four took *26 his turn in the office supervising the production, purchasing and performing all of the other administrative and executive duties while the other three were selling. The company employed no purchasing agent - each one of the four took his turn doing the purchasing for the company; the company had no employment manager or personnel director - each one of the four handled those problems when it was his turn to be in the office; the company employed no credit manager - while petitioner sold to approximately 1200 accounts these four men handled credit problems; the company employed no advertising agency nor any advertising or layout men - these four men did all of this work; the company employed no engineers to repair, design and build special machinery - these four men designed improvements on machines and developed special attachments which were constructed by them in the company's machine shop. The only employees of the company other than these men were the machine operators and laboring help employed in the plant. In the first year of the company's business it had net sales of $80,000. By 1940, the last year in which Wright was associated with the company, sales had increased to *27 $281,000. The year following Wright's death, sales were increased to $478,000 and in 1942, the first of the taxable years in question, sales were in excess of $757,000. Sales in 1943 were $570,000. This decrease in sales in 1943 from 1942 was not due to a falling off in demand for petitioner's products but was due to difficulties in getting materials for shipments, priorities, price regulations, import restrictions and difficulties in obtaining competent machine operators. The net profit of petitioner for the taxable year 1942 as shown by its tax return before federal income and excess profits taxes of $130,565.91, was $167,783.41. The net profit of petitioner for the taxable year 1943 as shown by its tax return before federal income and excess profits taxes for that year of $26,142.14, was $40,518.94. Compensation of the officers was fixed by the board of directors. As the success of the company became assured, the compensation paid to these men was gradually increased. It was increased in 1940, 1941 and again in 1942. In 1940 the board of directors established a policy of paying a $3,000 bonus to each of these four key men annually and that policy has been adhered to without variation *28 since then. The amount of the annual bonus paid to each of these four men has remained the same in subsequent years. Wright died in July 1940. Two years later, on May 2, 1942, the board of directors of petitioner company at a regular meeting decided that the business of the company would permit the board to pay increased compensation to these four key men. By action of the board the regular custom of a $3,000 annual bonus was affirmed and it was decided that each of the four men would be paid $200 per week as compensation for their sales work (said salaries to be effective as of June 5, 1942) and each of them would be paid $400 per month (effective June 1, 1942) as compensation for their administrative and executive duties. The president was given an additional $20 a week compensation. Reasonable compensation as salaries and bonuses for services actually rendered to petitioner by its four officers and employees in question for the year 1942 is as follows: Frank W. Bernet
$16,040
Carl P. Bernet
15,000
Hubert A. Bernet
15,000
J. W. Beahn
15,000
For the year 1943 reasonable compensation as salaries and bonuses for services actually rendered petitioner in *29 that year by these four officers and employees is the same as above. Opinion BLACK, Judge: The Commissioner in his determination of the deficiencies made several adjustments to the net income of petitioner as reported on its returns for the two years which are involved in this proceeding. None of these adjustments are in controversy except those involving the disallowance by the Commissioner of certain parts of the salaries and bonuses claimed by petitioner as deductions on account of compensation incurred and paid to its four officers, Frank W. Bernet, Carl P. Bernet, Hubert A. Bernet and J. W. Beahn. The facts with reference to these salary and bonus payments are rather fully stated in our findings of fact and we shall endeavor to not unnecessarily repeat them here. Respondent cites several cases in his brief in support of the proposition that the determination of the Commissioner in a case of this kind is prima facie correct and the petitioner is put to proof of the reasonableness of the amounts in dispute. Among the cases which he cites on that point are: ; ; *30 . These cases do hold, as respondent says they do, that in a case of this kind the determination of the Commissioner is presumptively correct. However, the instant case is not one which calls for the application of the doctrine of the presumptive correctness of the Commissioner's determination. We have here a great deal of evidence, stipulated, documentary and oral, bearing upon the reasonableness of the salaries involved in this proceeding and in view of this extensive evidence, we think this is a case to be decided upon its facts and not upon the presumptive correctness of the Commissioner's determination. There is no reason for further discussing that well known rule. In determining in any given case whether the particular salary is reasonable, the situation must be considered as a whole. Ordinarily no single factor is decisive. There are various tests which have been commonly applied in determining the reasonableness of the particular salary or compensation, such as the ratio of the particular salary and the aggregate salaries to gross income, the size of the particular business, the extent and scope *31 of the employee's work, the employee's qualifications and contributions to the business venture, amount of salaries paid to the particular employee in prior years, general economic conditions, prevailing salaries paid to employees performing similar services in a comparable enterprise, the availability of others to fill the office held by the particular employee, and salary policy of the corporation as to all employees. See Mertens Law of Federal Income Taxation, Vol. 4, Sec. 25.51. We have considered the foregoing factors, in so far as covered by the evidence in the record, in arriving at our conclusion of reasonable salaries which conclusion has been embodied in our findings of fact. Not all of the above-mentioned factors are represented in the evidence which is before us. Indeed, it is rare where we have all of such factors represented by the evidence in any one case. But in the instant case we do have a great deal of evidence, both stipulated and oral, bearing upon the reasonableness of the salaries incurred and paid to the four officers and employees of petitioner in question and it is upon a careful consideration of this evidence that we have made our findings of fact. We *32 do not deem it necessary to enter upon a detailed discussion of this evidence. In making our findings of fact we have found a reasonable salary for Frank W. Bernet was $1,040 per annum in excess of the salaries to the other three officers and employees. This is because Frank W. Bernet was the president of petitioner and had some additional duties to perform in that capacity which did not devolve upon the other three. It had been agreed and voted that he should receive $20 a week in excess of the compensation paid to each of the other three on account of his being the president of petitioner with some additional responsibilities which that office entailed. In our findings of fact we have given recognition to that differential because we think it has justification. It will be noted that our findings as to reasonable salaries is the same for both taxable years. It is true that the volume of sales and the amount of profits are both considerably lower for the year 1943 than for 1942. However, that was due chiefly to the difficulties of securing materials, labor and other causes connected with the War and these things did not lessen the labors and responsibilities of the four officers in *33 question and we have, therefore, made the same findings as to the reasonableness of salaries for the two taxable years. We think the evidence on the whole justifies these findings. Decision will be entered under Rule 50.